IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| CARLEAN D. BILLINGSLEY, | ) |
| | ) |
| Plaintiff | ) |
| | ) |
| v. | )   CV-08-BE-2291-S |
| | ) |
| MICHAEL J. ASTRUE, | ) |
| Commissioner of the Social | ) |
| Security Administration, | ) |
| | ) |
| Defendant. | ) |

**MEMORANDUM OPINION**

**I. INTRODUCTION**

On August 30, 2005, the claimant, Carlean D. Billingsley, applied for supplemental security income under Title XVI of the Social Security Act. (R. 37.) The claimant alleges disability commencing on March 1, 2005 consisting of major depressive disorder and personality disorder. *Id*. The state agency initially denied the claims on December 12, 2005. (R. 39-41.) Consequently, the claimant requested a hearing before an Administrative Law Judge (ALJ) on January 23, 2006, and appeared and testified at a hearing held on December 13, 2007. (R. 34, 232, 241-64.) In a decision dated April 26, 2008, the ALJ found that the claimant was not disabled under the Social Security Act, and thus, was ineligible for supplemental security income. (R. 14-25.) On May 8, 2008, the claimant requested a review of the hearing decision by the Appeals Council. (R. 9-10.) On October 10, 2008, the Appeals Council denied the claimant's request for review, and the ALJ's decision became the final decision of the Commissioner. (R. 4.) The claimant has exhausted all administrative remedies. This court has

jurisdiction pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3). For the reasons stated below, this court affirms the decision of the Commissioner.

## II. ISSUE PRESENTED

The claimant presents two issues for review. The first is whether the ALJ failed to give proper weight to the opinion of the claimant's treating psychiatrist. The second is whether the ALJ failed to properly evaluate the medical evidence of record.

## III. STANDARD OF REVIEW

The standard for reviewing the Commissioner's decision is limited. This court must affirm the Commissioner's decision if the Commissioner applied the correct legal standards and if the factual conclusions are supported by substantial evidence. *See* 42 U.S.C. § 405(g); *Graham v. Apfel*, 129 F.3d 1420, 1422 (11th Cir. 1997); *Walker v. Bowen*, 826 F.2d 996, 999 (11th Cir. 1987).

"No . . . presumption of validity attaches to the [Commissioner's] legal conclusions including determination of the proper standards to be applied in evaluating claims." *Walker*, 826 F.2d at 999. This court does not review the Commissioner's factual determinations *de novo*. The court will affirm those factual determinations that are supported by substantial evidence. "Substantial evidence" is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971)(quoting *Consolidated Edison v. NLRB*, 305 U.S. 197, 229 (1938)).

The court must "scrutinize the record in its entirety to determine the reasonableness of the [Commissioner]'s factual findings." *Walker*, 826 F.2d at 999. A reviewing court must not look only to those parts of the record that support the decision of the ALJ, but also must view the

2

record in its entirety and take account of evidence that detracts from the evidence relied on by the ALJ.  *Hillsman v. Bowen*, 804 F.2d 1179 (11th Cir. 1986).

## IV. LEGAL STANDARD

Under 42 U.S.C. § 423(d)(1)(A)**,** a person is entitled to disability benefits when the person cannot "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).  To make this determination, the Commissioner employs a five-step, sequential evaluation process:

> (1) Is the person presently unemployed?
> (2) Is the person's impairment severe?
> (3) Does the person's impairment meet or equal one of the specific impairments set forth in 20 C.F.R. pt. 404, subpt. P, app. 1?
> (4) Is the person unable to perform his or her former occupation?
> (5) Is the person unable to perform any other work within the economy?
>
> An affirmative answer to steps one, two, and four leads to the next question  On steps three and five, an affirmative answer constitutes a finding of disability  A negative answer to any question, other than step three, leads to a determination of "not disabled."

*McDaniel v. Bowen*, 800 F.2d 1026, 1030 (11th Cir. 1986); 20 C.F.R. §§ 404.1520, 416.920.

The testimony of a treating physician must be given substantial or considerable weight unless "good cause" is shown to the contrary.  *See Lewis v. Callahan*, 125 F.3d 1436, 1440 (11th Cir. 1997).  The ALJ may find "good cause" to reject a treating physician's opinion where the opinion is not bolstered by the evidence, where the evidence supports a contrary finding, or where the opinion is inconsistent with the doctor's own medical records.  *See Phillips v. Barnhart*, 357 F.3d 1232, 1240-41 (11th Cir. 2004).  A treating physician's report may be

discounted when it is not accompanied by objective medical evidence or is wholly conclusory. *See Edwards v. Sullivan*, 937 F.2d 580, 583 (11th Cir. 1991). The conclusions from a physician based on a one time examination are not entitled to the weight given to opinions from treating physicians. *Gibson v. Heckler*, 779 F.2d 619 (11th Cir. 1986).

## V. FACTS

Claimant, Carlean D. Billingsley, was twenty-nine years old and had a ninth grade education at the time of the administrative hearing. (R. 241.) She has prior work experience as a custodial worker. (R. 264.) Claimant alleges that she has been unable to work because of anxiety attacks since March 1, 2005. (R. 61-62.)

*Physical Limitations*

On March 24, 2005, claimant went to the Emergency Room at Brookwood Medical Center, located in Birmingham, Alabama, complaining of worsening depression. (R. 105.) This visit was the first psychiatric hospitalization for the claimant, although she reported a history of depression of at least ten years. *Id.* Claimant was diagnosed with major depression, recurrent, severe, without psychotic features; dysthymia (a lingering, less severe form of depression); and personality disorder not otherwise specified (NOS). (R. 106.) Her Global Assessment of Functioning (GAF) was 45. (R. 105.) She denied having any hallucinations or suicidal ideations. (R. 105.) The attending physician reported that the claimant was much improved the following day at discharge, prescribed Lexapro and Zyprexa for her, and instructed her to follow up with a local mental health facility. (R. 105-06.)

On June 10, 2005, claimant began treatment at Western Mental Health Center (WMHC), located in Birmingham, Alabama, for depression. (R. 128.) Western's intake form indicated that

claimant complained of anxiety. *Id.* Although claimant had suicidal thoughts a week prior, she denied having suicidal ideations at the outset of treatment. *Id.*

On June 16, 2005, claimant underwent an initial psychiatric evaluation with Dr. Wolfram Glaser, M.D., of WMHC, after presenting for treatment of depression. (R. 128.). Dr. Glaser diagnosed claimant with major depression, recurrent, severe; personality disorder NOS; and cannabis abuse. (R. 126.) Her GAF was 48. *Id.*

Claimant missed two meetings in July with Dr. Glaser (R. 124-25), but did meet with him again on August 26, 2005 (R. 122). They met again on October 21, 2005 for an eight week follow up, at which time claimant reported anxiety and that she thought her medication was not working. (R. 118.) On October 24, 2005, claimant helped develop her own treatment plan. (R. 113.) Claimant met with Dr. Glaser on November 7, 2005, at which point her medications "were helpful." (R. 154.) However, Dr. Glaser noted that the claimant stopped taking her medication on November 20, 2005 against his advice. *Id.*

On November 30, 2005, the Social Security Administration's Disability Determination Service (DDS) referred the claimant to Dr. Sally Gordon, Psy.D., for evaluation of mental status, functioning level, and social skills. (R. 130.) Claimant told Dr. Gordon that she had panic attacks, by which she meant not "do[ing] well on job interviews." *Id.* Dr. Gordon reported that claimant's medical records "indicate[d] diagnoses of depression, dysthymia, and personality disorder NOS, and [that] her coping skills were rated to be poor." *Id.* Additionally, claimant had "indicated suicidal thoughts since childhood but she had not previously reported panic attacks." *Id.* Dr. Gordon's prognosis was that the claimant "present[ed] with debilitating levels of depression and anxiety, which interfere[d] with all aspects of her daily living." (R. 132.) Her

GAF was 65. *Id.*

On December 6, 2005, Dr. Aileen McAlister, M.D., a DDS physician, determined that a Residual Functional Capacity (RFC) Assessment was necessary based on affective disorders, anxiety-related disorders, personality disorders, and substance addiction disorders. (R. 138.) However, the claimant met neither the "B" criteria listings (R. 148) nor the "C" criteria listings (R. 149).

On January 13, 2006, Dr. Glaser stopped claimant's medications and set up an appointment for the claimant with the University of Alabama at Birmingham's Community Psychiatric Program. (R. 154.) On March 13, 2006, claimant discontinued treatment at WMHC. (R. 153.)

In August 2006, claimant began treatment at Catholic Family Services, meeting with therapist, Crystal Mullen. (R. 182.). Although Ms. Mullen was not able to "give [the claimant] a th[o]rough diagnostic impression," she recorded that the claimant's diagnostic impression was adjustment disorder and brief psychotic disorder. (R. 184.) Her GAF was 55. *Id.* Ms. Mullen also noted that the claimant had "recently ended an [eight] year relationship," which sent the claimant into deep depression. (R. 182.) Also, Ms. Mullen noted that the claimant had lived on the streets and used marijuana, and that she served jail time prior to being admitted to Brookwood Hospital. *Id.* As part of her treatment, claimant met with Ms. Mullen regularly. (R. 178-79.) Additionally, she was referred to Dr. Stone (R. 175), who prescribed her medication for her mental health (R. 160).

At the beginning of her treatment with Catholic Health Services, claimant had a Burns Depression Checklist score of 31 - severe depression, and a Burns Anxiety Inventory score of 54

- extreme anxiety or panic. (R. 187-88.) Three months later, claimant had a Burns Depression Checklist score of 13 - mild depression, and a Burns Anxiety Inventory score of 24 - moderate anxiety. (R. 169-70.) The following month, she had a Burns Depression Checklist score of 21 - moderate depression, and a Burns Anxiety Inventory score of 36 - severe anxiety. (R. 162-63.)

Claimant continued to meet with Ms. Mullen regularly. Progress notes indicate that her thinking was logical, her judgment and insight were fair, and her appetite was normal. (R. 157-60.) On one occasion in January, progress notes indicate that the claimant's sleep was abnormal (R. 158), but it had normalized by their February meeting (R. 157). At her February meeting, claimant indicated that she was in job training and had started taking GED classes. *Id.*

On March 6, 2007, Dr. Stone and Ms. Mullen completed a questionnaire that client's counsel drafted. (R. 155-56.) On the questionnaire, they indicated that the claimant had moderate restrictions in all areas but two. *Id.* They indicated that the claimant had marked "deficiencies of concentration, persistence, or pace resulting in frequent failure to complete tasks in a timely manner." (R. 155.) Additionally, they indicated that the claimant had a marked impairment in her ability to understand, carry out, and remember instructions in a work setting. *Id.*

*The ALJ Hearing*

After the Commissioner denied the claimant's request for supplemental security income, the claimant requested and received a hearing before an ALJ. (R. 34.) The ALJ received the claimant's medical files into the record, Exhibits 1A through 12F. (R. 234.) The ALJ then summarized the record before the claimant began her testimony. (R. 237-41.)

The claimant testified that she was hospitalized in March 2005, and that she was using

marijuana at that time. (R. 243.) She testified that she no longer used marijuana and was on two prescriptions. (R. 243-44.) The claimant testified that her prescriptions were working, that she was more active, trying to cope with the world, talk to different people, and get along with people. *Id.* However, she also testified that the medications have the side effect of upsetting her stomach and making her feel weak. (R. 247.)

The claimant reported that the main symptom of her mental illness was anxiety, which manifested in the form of panic attacks about every other week. (R. 250.) She also testified to having delusions and hallucinations, but not at the time of the hearing. (R. 251.)

The ALJ then asked the claimant about her living conditions. The claimant testified that she was able to take care of her own needs, take a bath or shower, and dress herself without assistance. *Id.* Additionally, she testified that she tries to live a normal life and takes care of her own household work, including doing the laundry, cleaning, grocery shopping, cooking, and paying the bills when she has the resources. (R. 252-53.)

Regarding her employment history, the claimant testified that she worked as a custodian for the Birmingham Board of Education, and performed janitorial services for UAB. (R. 255.) The record indicates that she worked for UAB from 1998 to 1999 and for the Birmingham Board of Education in 2006. (R. 51.) She testified that she was terminated from UAB for tardiness, despite also using drugs at the time of her employment. (R. 255-56.) She also testified that she went to California and worked as a telemarketer, but was unable to articulate for the ALJ how she provided for her needs, aside from receiving food stamps. (R. 256-57.) Additionally, the claimant testified that she worked for the Easter Seals, but that she quit after being sexually harassed. (R. 258-59.)

After the ALJ had finished asking the claimant questions, her attorney questioned her regarding the nature of her work, including whether the work was full or part time and whether, in her condition, she would have been physically capable of performing the work. (R. 259-64.) However, after repeated attempts by the attorney, the claimant was unable to address those particular areas of her employment history. *Id.*

The ALJ then heard testimony from Dr. David Head, the vocational expert. (R. 264.) Dr. Head classified the claimant's past work as environmental services, medium in exertion, lowest level of semi-skilled with a Specific Vocational Preparation (SVP) value of 3. (R. 264-65.) The ALJ then asked questions based on two hypothetical situations. The ALJ based the first hypothetical situation on an opinion of the claimant's condition found in the state agency assessment. (R. 265.) The first situation imagined a twenty-six year old woman with a limited education; a history of work at the medium semi-skilled level; no exertional limitations based on medically determined impairments; and the capacity to understand, remember, and carry out simple instructions over an eight hour period with routine breaks. *Id.* Further, this worker would require nonconfrontational and casual contact with co-workers, supervisors, and the general public; and a work situation where changes would be introduced slowly. (R. 265-66.) Dr. Head testified that such a person could not perform any of the claimant's past work, either as she did it or as it is generally done. (R. 266.) Dr. Head also testified that such an individual could perform other full time work in the economy and gave three examples: 1) cleaning jobs in a remote area in the evening, 2) assembler, and 3) material handler. *Id.*

The ALJ based on the second hypothetical situation on Dr. Stone and Ms. Mullen's answers to the questionnaire. *Id.* In the second situation, the ALJ asked Dr. Head to assume that

9

the individual had a marked deficiency of concentration, persistence or pace resulting in frequent failure to complete tasks in a timely manner in a work setting or elsewhere. (R. 267.) Additionally, this individual would have a marked impairment in understanding, carrying out, and remembering instructions in a work setting. *Id.* Dr. Head testified that such an individual could not perform any of the claimant's past work, either as she did or as it is generally done. *Id.*

*The ALJ's Decision*

On April 26, 2008, the ALJ issued a decision finding that the claimant was not disabled under the Social Security Act. (R. 14.) First, the ALJ found that the claimant had not engaged in substantial gainful activity since the alleged onset dates. (R. 16.) Although the claimant was employed at different points within this time, the ALJ found that the employments were "unsuccessful work attempts." *Id.* Second, the ALJ found that the claimant was impaired by "psychosis, [personality disorder] NOS, and marijuana abuse," which resulted in "more than minimal limitations in the claimant's ability to perform work-related activities." *Id.*

Third, the ALJ found that the "claimant's mental impairments . . . do not meet or medically equal the criteria of listings 12.03 or 12.09." *Id.* To make this determination, the ALJ first considered whether the "paragraph B" criteria had been satisfied. *Id.* "Paragraph B" criteria are satisfied if the mental impairments result in at least two of the following: 1) a marked restriction of activities of daily living; 2) marked difficulties in maintaining social functions; 3) marked difficulties in maintaining concentration, persistence or pace; and 4) repeated episodes of decompensation, each of extended duration. *Id.*

Because the claimant lives on her own, cooks, cleans, shops, drives, and performs her own personal hygiene adequately and without assistance, the ALJ found that she has no more

than a mild restriction in activities of daily living. (R. 17.) While the claimant has a strained relationship with her family and has had conflicts with neighbors, her landlord, and some employers, she does continue to have a relationship with her family, reports having friends with whom she socializes, and has consistently demonstrated adequate social skills when seeing her therapist and doctor. Therefore, the ALJ found that the claimant has only moderate difficulties in social functioning. *Id.* Because the record as a whole indicates that the claimant has the capacity to concentrate sufficiently to follow at least simple instructions and to perform simple tasks to completion as illustrated by her ability to maintain a daily journal and attend GED classes while working, the ALJ disregarded the opinion of the claimant's therapist, Ms. Mullen, and treating psychiatrist, Timothy Stone, M.D., and found that the claimant only has moderate difficulties regarding concentration, persistence, or pace. *Id.* The ALJ did find that the claimant had experienced one to two episodes of decompensation; however, these instances were mitigated by the claimant's recent release from jail, the end of an eight year relationship with her boyfriend, and her marijuana use at the time. *Id.* Because the ALJ found that the claimant did not exhibit as least two marked limitations, the ALJ determined that the "paragraph B" criteria were not satisfied. *Id.*

In addition to the "paragraph B" criteria, the ALJ considered whether the claimant's impairments satisfied the "paragraph C" criteria. (R. 18.) Because the medical evidence contained within the record did not show that the claimant's psychosis was so severe as to cause repeated episodes of decompensation of extended duration, or that it was of such marginal adjustment that any increase in mental demands or changes in the environment would be expected to cause decompensation, and because the medical evidence did not demonstrate a need

for a highly supportive living arrangement, the ALJ found that the evidence did not establish the presence of "paragraph C" criteria. *Id.*

Fourth, the ALJ found that the claimant had the "residual functional capacity to perform a full range of work at all exertional levels and [was] capable of understanding, remembering, and carrying out simple instructions over an eight-hour workday with routine breaks; can tolerate casual, nonconfrontational contact with co-workers, supervisors, and the general public; and can tolerate changes in the workplace that are introduced slowly." (R. 18.) In reaching this conclusion, the ALJ had to consider the claimant's symptoms and the extent to which the symptoms were consistent with objective medical evidence. *Id.* In considering the symptoms, the ALJ followed a two step process in which he had to determine whether underlying medically determinable impairments could reasonably produce the claimant's symptoms, and he had to evaluate the intensity, persistence, and limited effects of the symptoms to determine the extent to which they limited the claimant's ability to do basic work activities. *Id.* While the ALJ did find that "the claimant's medically determinable impairments could reasonably be expected to produced the alleged symptoms," he also found that the "claimant's statements concerning the intensity, persistence, and limiting effects of these symptoms [were] not credible to the extent they [were] inconsistent with the residual functional capacity assessment." (R. 19.)

In making this conclusion, the ALJ considered the opinions of the Dr. Stone and Ms. Mullen as reflected on the supplemental questionnaire in evidence against the totality of their treatment notes. (R. 22.) The ALJ found that the actual treatment notes from Western Medical Health Center and Catholic Family Services supported the determination of the residual functional capacity assessment. (R. 23.) As such, the ALJ gave "greater weight to the opinions

of Dr. Gordon as reflected in the body of her report and to the opinions of the state agency medical consultants than to those of Dr. Stone and Ms. Mullen as reflected in the supplemental questionnaire . . . ."  (R. 22.)

Fifth, the ALJ found that the claimant was "unable to perform any past relevant work." (R. 23.)  The claimant's past relevant work was low semiskilled.  *Id.*  Because the claimant is restricted to unskilled work, she is unable to perform the type of work previously performed.  *Id.*

Sixth, the ALJ found that the claimant was a younger individual age 18-49 because she was born on December 26, 1978 and was twenty-six years old when she filed.  *Id.*  Therefore, the ALJ "d[id] not consider that [the claimant's] age [would] seriously affect [her] ability to adjust to other work."  20 C.F.R. § 416.963(c).

Seventh, the ALJ found that the claimant had "a limited education and [was] able to communicate in English."  (R. 24.)

Eighth, the ALJ found that the "transferability of job skills [was] not material to the determination of disability because using the Medical-Vocational Rules as a framework support[ed] [the] finding that the claimant [was] 'not disabled,' whether or not the claimant [had] transferable job skills."  *Id.*

Ninth, the ALJ found that a significant number of jobs are available in the national economy that the claimant could perform.  *Id.*  The ALJ supported his conclusion based on the testimony of the vocational expert who testified that specific jobs existed in significant numbers that an individual with the claimant's age, education, work experience, and residual functional capacity could perform.  *Id.*

## VI. DISCUSSION

### A. The ALJ did not fail to give proper weight to the claimant's treating psychiatrist.

The claimant argues that the ALJ failed to give proper weight to the treating psychiatrist. To the contrary, this court finds that the ALJ did not fail to give proper weight to the treating psychiatrist.

The ALJ must give substantial weight to the testimony of a treating psychiatrist unless he demonstrates "good cause" for doing so. *MacGregor v. Bowen*, 786 F.2d 1050, 1053 (11th Cir. 1986). The ALJ may discredit the opinion of the treating psychiatrist provided that he "specif[ies] what weight is given to a treating physician's opinion and any reason for giving it no weight . . . ." *Id.* The ALJ has "good cause" when the opinion is not bolstered by the evidence, where the evidence supports a contrary finding, or where the opinion is inconsistent with the doctor's own medical records. *See Phillips v. Barnhart*, 357 F.3d 1232, 1240-41 (11th Cir. 2004). While the opinion of a consulting physician receives little weight when it contradicts the opinion of the treating psychiatrist, *Lamb v. Bowen*, 847 F.2d 698, 703 (11th Cir. 1988), the weight to be given depends on the extent to which it is consistent with other evidence and supported by clinical findings. *See* 20 C.F.R. § 404.1527(d)(3)-(4); *see also Crawford v. Comm'r of Soc. Sec.*, 363 F.3d 1155, 1158 (11th Cir. 2004) (ALJ did not err relying on consulting physician's opinion when consistent with medical evidence). Additionally, the ALJ may rely on a consulting physician's report to the extent that it does not contradict the evidence. *See Edwards v. Sullivan*, 937 F.2d 580, 584-85 (11th Cir. 1991).

In this case, the ALJ acknowledged that the claimant's treating psychiatrist and current therapist both opined through questionnaires that claimant's counsel drafted that the claimant had

marked limitations in the area of concentration, persistence, or pace; however, the ALJ declined to follow their stated findings because they were not supported by the treatment notes or other medical evidence.  Dr. Stone's notes indicate that the claimant reported to him that her hallucinations had improved and that she was only occasionally having mood swings; additionally, on the day he jointly completed the questionnaire with Ms. Mullen, he only observed that the claimant's affect was "somewhat odd" and that she seemed irritable.  In her treatment note, Ms. Mullen indicated that she questioned whether the claimant actually experienced hallucinations.  Ms. Mullen's notes also indicate that the claimant was maintaining a daily journal for her sessions with the therapist and working towards obtaining her GED, which supports an inference that the claimant is able to follow simple instructions and perform simple tasks to completion.  When she began counseling with Catholic Family Services, the claimant was assigned a GAF of 55, which is consistent with only modern impairment.  Therefore, this medical evidence contradicts the opinions of Dr. Stone and Ms. Mullen and establishes good cause for rejecting their opinions.

   The ALJ's opinion also comports with the report of Dr. Gordon, who evaluated the claimant's mental status, functioning level, and social skills for DDS.  Like Dr. Stone and Ms. Mullen, Dr. Gordon's records reflect subjective complaints from the claimant, but lack any medical findings that the claimant suffers from her alleged disability.  Dr. Gordon's report indicated that the claimant's memory was intact; that she was able to attend to the demands of the interview without difficulty; that she was able to repeat a complex sentence and execute a three-state command; and that she could repeat up to five digits forward and three backward.  Dr. Gordon also commented that discrepancies existed between what the claimant self-reported and

the information contained within her medical records. Dr. Gordon assigned the claimant a GAF of 65 indicating only mild symptoms. Therefore, because Dr. Gordon's report was consistent with other medical evidence, the ALJ did not err when he relied on the report.

Based on the treatment notes of Dr. Stone and Ms. Mullen - which were inconsistent with their findings -  and the findings of Dr. Gordon, the ALJ demonstrated good cause for rejecting the opinion of the claimant's treating psychiatrist.

### B.  The ALJ did not fail to evaluate the medical evidence of record properly.

The claimant argues that the ALJ failed to evaluate the medical evidence of record properly. To the contrary, this court finds that the ALJ did not fail to properly evaluate the medical evidence. The ALJ must determine residual functional capacity based on all of the evidence in the record. *Lewis v. Callahan*, 125 F.3d 1436, 1440 (11th Cir. 1997); 20 C.F.R. § 404.1545(a)(1). The ALJ in reaching his conclusion waded through the entirety of the medical record. In determining the claimant's residual functional capacity, the ALJ evaluated the self-reported complaints of the claimant, the treatment notes, and the findings of all the medical professions, including doctors at Brookwood Medical Hospital, Western Medical Health Center, Catholic Family Services, and the Social Security Administration's Disability Determination Service. Therefore, this court concludes that the ALJ did not fail to evaluate the medical record properly.

## VII. CONCLUSION

For the reasons as stated, this court concludes that substantial evidence supports the decision of the Commissioner and is due to be AFFIRMED. This court will enter a separate order to that effect simultaneously.

DONE and ORDERED this 16th day of March 2010.

_____
KARON OWEN BOWDRE
UNITED STATES DISTRICT JUDGE